Good morning. Final case of the morning, number 13-20753, Gil Ramirez Group v. Houston Independent School District at AL. We're here for Mr. Dunn. I'm used to seeing you on election cases, Mr. Dunn. I occasionally do others. It's nice to see you, Judge. The last time I saw you, I believe it was through a video, so I'm happy to see you here well today. May it please the Court, my name is Chad Dunn. I, along with Ms. Prather, represent the appellants Gil Ramirez and the Gil Ramirez Group in this incredibly important public corruption case. I want to spend my time before the Court talking about the facts because we believe the grievous error of the District Court here was to decide the facts and take that opportunity away from the jury. There are enormous amounts of documents, testimony, declarations that were considered in this case. The summary judgment that was granted was granted just days before the trial was to begin. There were scores of subpoenas to witnesses who were to be brought before the courthouse and testify about their activities in this case. I have a question. My question has to do with the District Court's determination on the RICO claim that there's no injury because there weren't specific damages related to a specific contract. That does not appear – that's arguably not the way I understand the law. But at trial, though, would you have to come forward with the damages that it's worth? It would say, we estimate that you have gotten so many percentages of these contracts that you could have, and so the loss of estimated damages is such and such. Or how do you prove up what your damages are in a scenario where you were in the game and then you weren't in the game to determine what would have gotten you if you had been in the game? Well, I agree, Judge Elrod, that that's an incredibly important issue that will come up at trial. And from our standpoint, we had intended to prove damages in multiple ways. First, there was the reliance damages. My client spent approximately $180,000 preparing a complicated bid, insurance, bonding, all the other things that go with it, in order to have a reasonable shot of getting contracts under the JOC. So in that case, we think we submit that reliance damage to the jury, and they determine to what extent did we not get the benefit of our bargain, and should we get back some of the reliance damages. That's number one. In that case, I don't think an expert is necessary. Number two on damages, though, gets to the expectation of the contract and what we'll call lost profits. And obviously, I'm familiar with this court's opinions in being careful not to submit damages to the jury that are speculative in nature. But what we had in this case was an extensive, decades-long experience with another contractor doing this type of work and getting paid for it. We also knew what the projects were. In addition, and this didn't find its way into the briefing because this issue I don't think came up much in the briefing, but there was testimony from HISD personnel that the projects were going to be divided evenly among the JOC contractors because there was a number of them that were backlogged. So in a regular case, perhaps, you know, I start a restaurant, it fails within a few months, it's incredibly difficult to prove what my lost profit is. So in a lot of cases, we talk about respectability, that the business is ongoing, but this is definitely an ongoing business with the relationship. I don't see that's objected to. There's no question about that. But the issue is that you have somebody who would say that they would have gotten this proportion of the contracts or they might have gotten. They lost the opportunity to get that proportion. Yes, Judge, we had three ways we were going to go about proving that. The first is that we had hired a CPA lawyer accountant who had gone through the records of not just the Ramirez Group, the other JOC contractors, including the ones that were added into the contract after the fact, and including the JOC contractors that had had the contract for years. And that expert calculated what the profit margin was. He also went through a number of the projects that were, or not a number of, all of the projects that were queued up to be worked on and came up with a figure. What do you do with the opposing counsel's argument that you wouldn't have gotten these anyway because they changed their specs and you couldn't compete in specs, not you personally? I understand, Judge. Well, first, now what we're doing is weighing facts. We're weighing facts in the summary judgment stage. That's their position. That's what they say would have happened. But was there a position presented to the judge on that? Yes. First, there was the declaration of our client who had multiple contacts with the procurement department and was told on multiple occasions, you are the best value for the district. You will continue to receive these contracts. You will receive your greater share of these contracts. In addition to that, there's the testimony that the contract system in the past had worked uniformly over decades. And so this notion that all of a sudden it was going to change now. Well, let me – I see the – and this feeds into your RICO argument because we've got to get to the – he wiped you out on all of the claims, so you have to have a chance to get to them all as you need it. But I see a distinct difference between the end of 2009 when suddenly he had been doing a bunch of contract work and suddenly it got cut short when he decided not to give money to Mr. Marshall. And those – you can directly extrapolate from the early part of 2009 to the later part of 2009. I see it as being somewhat more tenuous when you talk – when your brief and the district's brief have totally opposite views of why they went to a request for proposal or qualification procedure in 2010. Both of them have plausibility. I think a jury ought to decide them if they're actionable claims. But there, that's where you're lower on the rankings and your expectation of becoming a JOC is a little different situation than it was in late 2009. I'm sorry if I missed the question, Judge. I'm not – Well, on the second half of it, it seems to me the argument that you had no economic damage is a little more persuasive than it is on the late 2009 contract. So I would respond in two ways to that. First, I might allude to what Your Honor said in the beginning of her statement. I think that is putting the cart before the horse. That would have this court be predetermining or, as the district court did, predetermine the facts. Let the jury sort it out. Let the jury decide what you can do by charge. Here are the damages we attribute to this action. Here are the damages we attribute to that. Let them determine that evidence and then review a full record. Part of the problem we have here is a critically important case decided on thumbing through paperwork and reading through testimony. And the court has some incredibly important legal issues, many of which have never been decided by the circuit to determine this case, some of which we have the better argument on, some of which I'll concede we have a harder argument on. But for this court to decide it on this paperwork for this type of case, it's got to submit it to a jury. I mean essentially what the district court decided to do was close the courthouse to anyone who does business with government and thinks they can prove a case that the reason they lost business with government was due to corruption. They can't even put it to a jury. You know, I'm sure there's Fifth Circuit law on this. You all cited the Supreme Court and you cited some other circuits, but I'm sure there's Fifth Circuit cases because I remember reading one that Judge Higginbottom wrote. But it does – I guess what they're essentially arguing is that it was a superseding cause in a way under RICO that although you were in the hunt to be selected for JOC in 010, you weren't assured of that, and you were down so low on the rankings that you could not possibly have lost because of the falderaw going on in the back rooms. Well, on the – I understand that that's HISD's argument. Now on the rankings, 50% of the ranking was based on the coefficient when certain favored contractors were told to agree to the same coefficient. And they're already rigging that according to you. Exactly. There's emails, in fact, from HISD personnel to two favored contractors saying you need to lower your coefficient. Now HISD says that opportunity was extended to others, but nowhere is that email to be found, and the Ramirez is denying it. But that's a fact issue. Absolutely. So what's your response to the argument that HISD could not be held liable under RICO? Well, first, that's a question that hasn't been answered by the Fifth Circuit yet. Second, I'm going to start with the statute, as was so important in the earlier argument. The statute says a person can be sued under RICO, and a person is defined as any entity that can own a legal interest in property. So from a statutory standpoint, HISD fits the bill. Now, ultimately, the decision of whether HISD can be a part of the RICO enterprise and part of a RICO defendant will need to be decided in this case if it's submitted to a jury. But let's decide it once the jury tells us what the facts are. Let's decide it once we determine who all involved in HISD was involved in the process. How would you pose an issue to the jury to ascertain that? Would it be RICO claims list these defendants who are liable for RICO violations HISD? Is that the way you do it? Yes, sort of like a broad form negligence submission. Which of the parties below? Of course, the Fifth Circuit has RICO pattern jury instructions that we would follow. But which of the parties below participated in the enterprise? And certainly, the district court could craft some special issues. One of the arguments that HISD makes is that HISD can't form for itself the mens rea, so to speak, to have committed the act. Well, first, we know from the First Amendment in the 1983 claims that this court and the Supreme Court has said that that argument doesn't work. The government is going to be liable whether it can commit an intentional act or not. Its officers can commit an intentional act. And in this case, it was the president of the Board of Trustees who was committing the intentional act. Counsel, are you through with that answer? Yes, sir, I am. I want to go back. I'm not satisfied with what we've said about 2010. The school district says that after the superintendent called off the item on the agenda, he started all over, and the JOC group now was decided and the board approved it. And you're at the bottom of the list. You don't get on JOC, so we know you don't get any jobs. Counsel, you're happy with 2009, maybe not after August, and I see that Ms. Clay wasn't getting much money during 2009. That may explain it. This picture is terrible, terrible. It's very, very unpretty. But I don't see your claim for even maybe getting more jobs since you had jobs all through 2009. At least between August of 2009 and 2010, you're not on JOC. And in your reply, you don't hit this very well. You have got to undermine what the school district did with the new superintendent. Granted, they had maybe a bad man on the board, but you have to undermine that whole process that happened after they stopped their old system, went through the effort, the board approved it. You're going to have to in your case, and I don't see it in your brief, that you can do it. Well, I understand, Your Honor, and perhaps maybe if you were on the veneer panel, I might try to strike you. But I think if you gave me three weeks and let me call the witnesses that I know what they will say, you would be convinced at the end of this process. I'm satisfied that Judge Ellison has got enough for me to decide the case that's before me. I hear you, Judge. Now, one of the things that I'd like to ask the court to do in the last few minutes I have here today is to look at some of the record. And, Judge Jones, you mentioned earlier in the introduction to give you some record sites. I want to walk through some things in the record. One of the things that I think is critically important for this court to look at that gets no discussion in the district court opinion is the recording of Mr. Medford where he admits exactly what he was doing. Number one, Mr. Medford says that it was their decision that they pushed HISD to open up the JOC contractors to additional people. That's in the record at 90. Well, I think if you've got those in your brief, we'll be able to figure those out. I'm sort of interested in the exact claims because there are many legal defenses raised to the claims. And the claims against Mr. Marshall, if I understand correctly, are tortious interference and due process and RICO. Is that correct? The ones that you appealed? Due process, equal protection, tortious interference. Right. And what is your response on the tortious interference that he can't be sued because the district is sued? Well, the district wasn't sued in tortious interference. I understand that. But they're arguing it's the same facts. I understand that. But the district was sued on a conspiracy theory in the RICO case. The district wasn't sued under tortious interference. I understand. And so I guess that's our response is that the only way the state statute applies is when the state officer and the government are sued on the same claim. And what about the fact that Marshall may be labeled, oddly enough, an employee under the Texas Education Code? Well, the statute defines employee as, A, somebody who's paid and who's working in the interest of the district. We're saying, A, he wasn't paid. He's not an employee. Wasn't on the payroll. B, he was working in his own private interest. Does he have to be under the control of the district to be an employee? Isn't that part of the, who is not under the, who they have the right to control? Exactly. There's no evidence in this record that they have the right to control the head of the board. In fact, that's the opposite of the board, isn't it? That's absolutely true. Their function is to control the organization, not for the organization to control the board. I agree entirely. And I just have one, you know, ten seconds left. I want to, from 96-97 in the record, Mr. Medford says it's just the way they do business, the way they're always going to do business around public works at HISD after talking about putting $9,000 in cash with some whiskey glasses and handing it to Mr. Marshall. I can guarantee this is the way business will take place if this case doesn't see a jury. I have one other question before you'll have time for rebuttal. Are you appealing the dismissal of your claims against Joyce Clay? Yes. Okay. And also, I want, on rebuttal, I'd like to hear about the tortious interference claims against RHJ and FDM. I understand. Thank you. All righty. Mr. Michel. I'm sorry. Mr. Morris had the first. Yes, Your Honor. Good morning. Sorry. Your Honor, my name is Rick Morris. I'm here today representing the appellee, Mr. Marshall. As the Court's probably aware, some of the individual defendants and owners of these vendor companies have ceded time to myself and Mr. Arturo Michel, who is here representing HISD today. So, let me ask the question about how does the property permit to be dismissed if they didn't move for dismissal? Your Honor, I believe that Joyce Moss Clay, for instance, joined in the motions that were filed by my client, Mr. Marshall, and the Court, in its opinion, actually gave the parties, some of those parties, additional time to file briefing. The Court was struggling with finding any support for a conspiracy because, as the Court noted in its opinion, it couldn't find an underlying tort, and in the absence of an underlying tort, the conspiracy claim against those co-defendants would have failed. What about RHJ and FDM? Yes, Your Honor. For the same reason, I believe the Court, Suspante, included dismissal of the claims against those defendants. But they didn't join in the motions. I don't know that RHJ did, Your Honor. I don't recall that, but I think it was within the power of the Court to grant dismissal of Suspante. Your Honor, I think that we're here today asking that you affirm the dismissal of the plaintiff's claims for three principal reasons. The plaintiff's lack standing, the plaintiff's Section 1983 claims under the First and Fourteenth Amendment were not causable claims under the law, and the plaintiff's state law claims, particularly against Mr. Marshall, were properly dismissed pursuant to the Texas Court Claims Act's election of remedies provision. If I say nothing else here today, I want to utter these words to you because I think they're critically important, and they probably fall under the heading of Justice Jones' comment earlier today that no good deed goes unpunished. It is the great irony of this case that GRG, which the 2010 Evaluation Committee ranked 10th out of 13 vendors, complains that it was not allowed to continue performing work for HISD, that it was only able to perform in the first place because former HISD administrators violated state procurement laws in the Fourteenth Amendment of the United States Constitution when they discarded the rankings and scorings of the Evaluation Committee and added the appellants to the panel for reasons of diversity. Your Honor, is the right approach for someone who's personally accused of all of these shenanigans? I mean, I don't really see that this is some benevolent action. I'm not confused by that. Your Honor, I'm not suggesting it is benevolent action. What I am suggesting, and I think it was embodied in Judge Reveley's question, is that the HISD administration, under new leadership, a new marshal in town, when they discovered the problems with the 2008 procurement, and these are criminal violations of procurement laws, they did what they were supposed to do. Well, at least he didn't bribe anyone. I'm sorry, Your Honor? At least it's not alleged that GRG bribed anyone. And I wouldn't suggest that they were. All right, well, we understand your equitable argument, and you can present that to the jury if it gets there. Tell us why Mr. Marshall would be immune from a RICO violation. Well, Your Honor, I don't know that he would be immune from RICO violations, but I do believe that the trial court was correct in finding that the plaintiffs had not established standing to pursue those claims under the RICO statutes. Now, there are two, as I said unclearly, I broke this down. With regard to the end of 2009, how can they not have standing based on the simple fact that they had done X amount of contract work as a JOC earlier in 2009, forgetting how they got that position, but they had done X amount of contract work. There's Y amount of contract work in the last part of 2009. They not only got a no, they got zero, right? So how can they lack standing to claim that they're injured for at least that amount? Well, Your Honor, because I think there are two prongs of the standing analysis. One, they have to establish more than a mere expectancy that they would receive additional contracts under that, additional jobs under that contract. And second, they have to show proximate cause. Well, as far as the standing goes, isn't that just completely negated by the Supreme Court decision in the Bridge case, which also had bidders on a lien contract? No, I don't believe it is, Your Honor, because of the certainty associated with the vendors getting some of those contracts. It was a numerical certainty that they would. And I think what's important here is to understand the uniqueness about job order contracting in Texas as distinct from other forms of procurement. Essentially, the job order contracting allows the district to procure a panel of contractors who can form jobs as needed, if needed. The procurement process merely identifies a panel of qualified vendors who will do the work for a certain price. But as provided for the contract itself, the district had no obligation to award any work. I fully understand that. But to proclaim that as a matter of law, it seems to me, is a difficult deal because they had been a JOC, and for nine months they had gotten hundreds of thousands of dollars' worth of work, an X percentage of the work that had been given out, right? Yes. Credit to HISD's briefing in that regard, Your Honor. I think that HISD adequately briefs, and the facts are undisputed, that while that work did drop off after the summer of 2009, GRG did continue to receive some work. And they continued to, and the decline in that work started before RHJ became added to the panel and started doing work. Okay, now let's move to the 2010, you know, new procedures for JOCs. You know, the district's brief and Mr. Dunn's brief have two completely different versions about how this came about in 2010. Was it clear in the air from the previous questions about what had happened while trying to put everything under the rug publicly, or was it totally rigged yet again? And he says he has evidence it's totally rigged again. So from that standpoint, how can you make a matter-of-law argument that this party, GRG, is at the bottom of the totem pole if other people are being given sub rosa information on how to enhance their prospects? Well, Your Honor, what I would first say is that the record evidence simply doesn't support the contention that anybody was involved. But let's say we'll look at the evidence and he can tell us about the evidence, and if there's no evidence, say so. But if there were evidence about that, how can he lack standing at that point? Even at that point, Your Honor, even if that were the case, I think that we've cited briefing to you that suggests that the mere fact that you have the vagaries of a procurement process in and of itself, that would break the chain of causation, which is a required component for standing. One of those cases, Your Honor, is Anza v. Ideal Steel Supply Corporation, a Second Circuit 1999 case that says the direct injury test can be seen as wisely limiting standing to sue to those situations where the claim of causation leading to damages is not complicated by the intervening agency of third parties. And here we have undisputed evidence about the intervening agency of third parties, which were the people who participated in the procurement process. And there is no evidence in this record that any of those three individuals who did the ranking as they were required to do by law when they did the remedial procurement were in any way influenced by Mr. Marshall whatsoever. You are ultimately left with a lot of speculation and innuendo, but if you scour this record, you will be unable to find any evidence that Mr. Marshall influenced the doling out of projects at the end of 2009 or that he interfered with the remedial procurement process. In 2009, the tortious interference, there are no less than four independent reasons why the tortious interference claim fails. First of which, just under the general merits, there's not enough evidence that there was a prospective contract in play. As the court well knows, GRG ended up being ranked 11 out of 13 contractors by the selection committee. They first would have needed to be selected and then entered into a contract. So I think it's much to say that they thought they were entitled to receive a contract. Second of all, I think in failed response to Judge Jones's question, there's a separate provision of the Texas Education Code that does define school board members as professional employees entitled to immunity. And we've cited that as well because it requires an exhaustion of administrative remedies before you can assert state law tort claims against a board member. And it's undisputed that that did not happen in this case. What about interference with prospective contracts or relations? Well, and I may have been inartful, but that was what I was directly speaking to, Your Honor. There was no prospective contract in play here because of the tenuous participation of GRG in the 2010 procurement process. Well, you didn't say tenuous. I mean, they did spend a hundred and some thousand dollars getting prepared. That's not very tenuous. Well, Your Honor, I have no doubt that they might have spent money in doing that, as did every other vendor who participated in that process. And some succeeded and some did not. But when you're 11 out of 13 and there's no evidence that you were ranked unfairly by the committee members, in large part because one of the weighted criteria was price and they were beyond one of the highest people quoting in price. I mean, Tosha's interference with the contract means you have a contract. I don't dispute that. I'm not sure what the limit is on prospective business relations. In other words, you know, when someone goes out, your former employee goes out and starts no non-compete contract and he starts competing against you and you go bad-mouthing to everyone in the industry, you can't defeat a Tosha's interference claim on the basis that, well, he hadn't yet had that business.  But it also has to be more than simply I threw my hat in the ring along with 13 other folks. What's your best case for that? Well, I think it goes back to this Court's pronouncements regarding standing. I mean, is it not possible that HISD could have accepted all 13 of these contractors? It is possible, but the undisputed record evidence establishes that they assessed the amount of work they had and they concluded that there was only enough work to go around for four. And, of course, that's appropriate because if you extend too many contracts to too many people, the practical reality is nobody will compete for your business, Your Honor, because they don't get enough of it. There's just not enough of it to go around. And so for very legitimate, non-retaliatory, non-discriminatory, and non-unlawful reasons, the administration made the decision that it did. I say that I'm out of town. Could you please answer the question that I posed to the opposing side about the employee status of Mr. Marshall? I don't see how he's an employee under the statute because the HISD doesn't contain control over him. Your Honor, I hear what you're saying, and under common law, that would certainly Not under common law. Under the statutory definition, it is an exception. It exists without any control over him. Well, Your Honor, we would direct the Court's attention to a separate provision of the Texas Education Code, which speaks to that issue, and it essentially says, Your Honor, that it's not dependent on control. It's simply because he is a board member. 22051. 220514, yes, Your Honor. The other statute says that you have to have control, so how do we know that that statutory provision trumps the other definition of employee in this circumstance? I think that what we would suggest is the Court look to the Texas Supreme Court's decision in Franca v. Velazquez, in which the Texas Supreme Court did a similar type of analysis with respect to a resident of a hospital, and rather than look to the definition of employee within the Texas Tort Claims Act, it was undisputed that the resident didn't receive any remuneration, so you would think that that provision of the Tort Claims Act would have precluded What if Franca is the opposite? Because one is trying to expand the scope of election remedy, and the other is trying to restrict the scope. Assuming argument of Franca is exactly the opposite, do you have any authority that would be more on point? Nothing other than the reading of the statute in Franca's analysis, Your Honor. But I would say even if the Court were to disagree, I think the failure to exhaust administrative remedies would have foreclosed those state law claims anyway. He's not an employee under these definitions anyway. Well, under that provision, Your Honor, by statutory definition, he is an employee of the district. For that proposition, that's not unclear at all. Even in his private business capacity? If he's performing any duties that are in any way incidental to his school district business. All right. Thank you very much. Mr. Michel. May it please the Court. Central to HISD's position in this is the lack of evidence in the record showing a disputed issue of material fact. And I think you see it in various parts of the procurement process. Well, you don't. HISD isn't going to stand before us and claim that there were no irregularities in at least 2009 and 2010. Well, no, there are irregularities in most procurement processes at different times. But does that irregularity suggest or make it more likely that there was an illegal influence? I don't think that that occurs here at all. In fact— Irregularities but no illegal influence when a member of the Board is collecting well over $100,000 to steer business to his friends? You have that at one level, what an individual trustee is doing. What HISD is focusing on in our briefing, in our position, is if you look at the procurement process, from the process that is set up to its application to the decision, I believe there you do not have evidence of improper influence. In fact, I think what you have, for example, in the 2010 process is what appellant claims is things could have been done differently. In other words, if I were putting together a procurement process, I would have under past experience marked down RHJ, for example, for what they claimed to be lying on their application beforehand. I would have marked down KBR for having lawyers to be very aggressive and delay the process. He does say that, and he says more. He says that a couple of these bidders, I think it was FBM and maybe RHJ, if I have the timing correct, and a couple of others were informed here's the coefficient that you need, the cost coefficient that you need to meet, and that's 50% of the test, right? What happened, and I think if you look at the declaration of Elvis Eaglin, and in these aspects it's not contested. What happened is you've had in both the 8 and the 10 process a procurement delivery method that is highly dependent on price, 50%. And that is what resulted in the rankings. In fact, GRG, from its earlier experience, could have determined that a lower coefficient was needed. They did not. In both instances they ended up toward the end. Does it matter that someone in HISD is calling particular people as these bids are coming in to say you need to lower your coefficient? You're normally calling some people. Well, this is not a hard bid. This is a proposal process. What happens is they come in and they're ranked. HISD determines we are taking the number that we believe is needed to do the job, and as Mr. Morris said, you could let everyone in, but that wouldn't stand you very well with the business community. It's important as to whether you're going to get business in the future. So if you're ranked better because you get tips, isn't that part of the priority here? But the so-called tips, what's being alleged there is after the rankings were in and HISD was looking at the people who were at the top that they were going to select, then they were making determinations such as, well, let's look with we won't change the rankings on coefficient in 2008. What we're going to look at is the different components of it because we don't want to pay more for profit or overhead. So that's what happened in 2008. In 2010, what happened there is that they looked at how can we try to make these uniform so that if we're using two different contractors on a project where, let's say, the qualifications of all are essentially the same for what's needed in the job, we can have a uniform price. But that did not affect the rankings. In other words, look at it this way. Take out those allegations of the communications and the contact. The rankings would have remained the same. And you're saying that's established as a matter of law in the record? Well, what I'm saying is that there is no – that is not a disputed fact in the record. What you have is you have the declaration of Elvis Eaglin that is uncontroverted, that sets out the process, and then that you have the argument of appellants where they're coming in and say that I would have done it differently. That doesn't seem right. But that is not an irregularity in the process. Well, we'll look at the record on that one. We'll let him respond. Okay, what other – was it there was a conspiracy claim against the school district and what else? Well, the school district was really – there was equal protection. There was due process. There was First Amendment. I think that Judge Ellison was correct that there was no evidence of a conspiracy. There was no underlying tort on the freedom of expression claim, whether it's compelled speech. There simply isn't any – the public concern element is not met because there's simply no communication. There's no evidence in the record that this was other than the appellant saying, I do not want to go along with this, their own mental impressions of that. There was simply no communication at all. Now, you've been explaining to us the 2010 requalification as a JOC. What about the contracts at the end of 2009? I think the position of HISD there, again, is similar to what Mr. Morris was saying when he was quoting the case when he's talking about that the issue of standing has a causation element, and what you have in 2009 is you have both these alleged bribers and non-bribers both losing – both non-bribers and bribers losing work, gaining work. There really isn't anything to indicate that this alleged bribe was influencing work. And the JOC delivery method, as has also been explained now, is so that you prequalify. The amount of work and when you get it is going to vary according to time. I understand that, but at the same time he had successfully bid on several hundred thousand dollars' worth of projects, and it is only shortly after he meets with Mr. Aguirre, if I'm not mistaken, and says he doesn't pay to play that all of a sudden he gets no projects, right? Well, I think either Mr. – even if you take Mr. Aguirre's testimony and if you take the appellant's testimony, there's no indication that there was any communication with regard to that to anyone other than simply Mr. Amir's deciding, well, if that's how the game is supposedly played, I'm not going to do that. But there's no evidence. He's taken the fifth, right? Yes, he's taken the fifth. But you don't have the testimony that he told so-and-so yet. Correct, not admissible testimony. So there are disputes about what's going on at that point. Well, I think there are argumentative disputes, but I think factually there isn't a dispute as to influence on HISD administrators and what occurred. And then he meets with Mr. Marshall shortly after that, Aguirre. Well, I mean, that's again according to Mr. Marshall. Mr. Marshall, yes. Are there affidavits that say Mr. Aguirre did not pass on this information to him, to them, and that they had no knowledge of it across to Mr. Marshall? I mean, there's no affidavit that says that the information was not passed on, is there? Well, there's nothing that directly says various people did not do this, but there is the declarations, for example, of Mr. Marshall denied that this ever occurred, that he was ever influenced by any of this. All right. Let's see if I can think of anything else. Any other questions? Due process was the only other. Yes. I think the flaw in the class of one is that where it has been used, it has been used in a situation where essentially government is acting as a regulator, where they license someone, where the standards are fairly well determined and there's less subjectivity, which you would expect in a licensing situation in a zoning situation. Well, in a bribery situation, you can't get much more subjective than that. Well, but I believe for the class of one theory, what you have there is you have government as a consumer, where it's making a, in many ways, subjective determinations. And in a jock process, even if prices is the large component of it, you have experience, you have other qualifications that are harder to do. And I think that's the distinction that you see in the cases. You do not have class of one cases, for example, where you talk about employment decisions and hiring. Those are the ones that are the most analogous to what's occurring in the contracting process. Anything else? All right. Thank you very much. May it please the Court. In my remaining time before the Court, I intend to hit three issues, which include Judge Jones' question about tortious interference. Before I get there, I'd like to see if I can take some of the lily-white patina off of the 2010 rebid process and the allegation that there's no evidence that that process wasn't corrupted. Here's just a few excerpts of the record. Number one, KBR was given high marks, even though it had taken it 12 months and still hadn't agreed to an HISD form contract. Fort Bend Mechanical had refused to submit a conflict of interest form, which is critical because on that form they would have had to disclose $9,000 in a brown bag. It would have had to disclose the Super Bowl trip, the sending payments to Clay every month that were going to Marshall. And despite refusing to comply with the RFP and submit this conflict of interest form, FBM is rated high. RHJ gets rated high for its ongoing job performance, even though at that point it had only done one job for the district. And recall we know RHJ only got a contract because they were paying Marshall. Dr. Saavedra testified as to such. So RHJ wouldn't even be in the fold. Is Dr. Saavedra your friend, or is he an adverse witness in this? I think he's a neutral witness in this. I think Dr. Saavedra, what he testified is the reason that Gil Ramirez and Horizon and a few other folks got in in 2008 is because he was tired of the influence and he wanted to shake it up and put some new people in charge. But then he quit a year later. Well, he doesn't quit. According to his testimony, because he wouldn't give a contract to RHJ, Marshall pulls his support of him along with other board members, Paula Harris and Greg Myers, people that Pete Medford says he was paying, pull their support, and Saavedra was forced to resign due to lack of support. In addition, two of the three committee members in 2010 sent e-mails to Mr. Eaglin. Eaglin's the one that scratches out the affidavit saying this was all pretty and lily white. Two of the other three board members wrote e-mails to him, which are in the record, saying wait a minute, why are we going ahead with these two contractors? We rated Jamel and Smith low because they have financial problems right now. There was a second contractor that was ranked low, according to the other two members in their e-mails. And Mr. Eaglin moves forward with his rankings anyway. And, again, as has been already stated, 50% of the score is on the coefficient, and we know that certain contractors were getting specialized notice about what to put in their coefficient. So now on the second issue in addressing Judge Jones's question on tortious interference, the reason we brought an existing and a prospective tortious interference claim is because in 2009 we had an existing JOC contract, which folks paid money, Mr. Medford says in the recording, we made them open up the JOC program. These individuals who were paying Mr. Marshall had designed, RHJ in particular, to get itself in the JOC program, which necessarily damaged the contract that the Ramirez's already had. That's the existing claim. The prospective claim relates to the jobs we would have gotten under the 2009 contract and the renewal of the contract we allege we would have gotten in 2010. Now, Judge Ellison dismissed, and that's why we filed a notice of appeal on his earlier dismissal order and not just the summary judgment. The way Judge Ellison saw it is that it was only an interference in prospective contracts, even as it relates to 2009 because his point was you had a contract that gave you a right to seek this work, but it was the individual jobs, themselves their own contracts, that were interfered with. And I don't, you know, frankly, I guess it doesn't make much difference to me, the semantics of whether it's prospective or existing, but I still believe my initial analysis was right. Our initial contract was existing. It was interfered with. Our prospective contract, the renewal of it in 2010, was interfered with. That's why they're separate claims. Lastly, I want to talk to you. It's both existing and fled. Yes. But I wanted to explain to the court why our notice of appeal referenced the earlier dismissal order that had come months before, and that was because in case the court saw it as I did, I wanted to make sure we had perfected our appeal on both prospective. There's something in the argument, though, that Mr. Marshall and H.I. and all their claims, is there anything that remains against Clay and R.H.J. and F.B.N.? Well, I don't see how there's any way those parties get out of the tortious interview. I'm not trying to argue that. It's just a similar argument, though. Sure. I'm asking you, is there anything dangling for these other people that we have to deal with if that were the case? I understand. The court would have to decide that we hadn't stated tortious interference claims against those private parties. But Judge Ellison dismissed it all, so it's not—I'm not sure I understand Your Honor's question. It's not still pending in the district court. It's all been dismissed. What did you want to talk about? All right. Well, the last thing I was going to talk about that nobody's talked about yet is the breach of contract claim against HISD. So our position is that our contract said we had the right to submit to JOC, and we had to submit coefficient. There's all these things. Nowhere in the contract does it say, and by the way, your ability to get these actual jobs will be affected about whether or not you're willing to pay board members. And we're claiming that as a breach of the express terms of the contract for which, at the bare minimum, we ought to submit to the jury as it pertains to HISD. I see my time is up. We ask for reversal and remand for a jury trial. Thank you very much. All right. Thank you very much. Court will stand.